[774 NYS2d 39]

# EMF General Contracting Corp., Appellant-Respondent, v Michael R. Bisbee, Respondent-Appellant.

First Department, March 25, 2004

## APPEARANCES OF COUNSEL

*Mandel Resnik Kaiser Moskowitz & Greenstein P.C.* (*Richard M. Resnik* and *Alexander M. Jeffrey, Jr.* of counsel), for appellant-respondent.

*Picciano & Scahill, P.C.* (*Robin Mary Heaney* and *Francis J. Scahill* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SAXE, J.

In this action for specific performance of a contract to purchase real estate, we address the issue of whether a two-year delay between the signing of the contract and plaintiff's attempt to enforce it, along with a steep increase in the market value of the property by the time of trial, warrants a denial of specific performance. Contrary to the finding of the trial court, our review of the record reflects that plaintiff EMF General Contracting Corp. (EMF) established not only its right to relief based upon defendant's breach of the contract, but also its right to specific performance of the contract covering the two parcels of property located on Carpenter Avenue in the Bronx, for the contract price of $7,500 per lot.

*Facts*

Plaintiff EMF, a construction company, entered into a contract on March 3, 1998, to purchase two vacant parcels of property (Lots 16 and 116) located on Carpenter Avenue in Bronx County from defendant Michael Bisbee and nonparty Benjamin Rosenberg* for a purchase price of $7,500 per lot. EMF's president, Frank Porco, was an experienced builder, and most of his business was conducted in Bronx County. Michael Bisbee was a registered mortgage broker for over 17 years, and was familiar with the process of property valuation, and with the purchase and sale of property. Bisbee stated that in 1989, he had entered into a partnership with Harry Cohen, Benjamin Rosenberg, Maurice Morris and Harvey Rodney to purchase Lots 16 and 116, along with the adjacent Lot 17, on which was located a two-story residential dwelling. Each partner allegedly had a 1/5th interest in the three lots. However, Rosenberg was named as the record owner on the deed to Lot 16, Harry Cohen was the record owner of Lot 116, and Bisbee and Maurice Morris were named as co-owners on the deed to Lot 17. Over time, because Bisbee's partners owed him money, an understanding arose that Bisbee would take ownership of Cohen's Lot 116.

Bisbee claimed that he entered into the contract at issue seeking a quick sale, as there were unpaid tax liens on several parcels, including the parcels for sale, and he needed money to pay off the liens. No "time of the essence" provision was included in the contract, however.

Pursuant to the contract, EMF gave defendant Bisbee a $1,500 down payment which Bisbee's attorney deposited into an escrow account; a closing was scheduled to take place on or about April 30, 1998. However, the scheduled closing did not occur, due to concerns brought to light by the survey and title report.

First, a boundary line issue arose when the survey of Lots 16, 17 and 116 revealed that a driveway on Lot 17 encroached upon Lot 116, which problem was reflected in the title report. EMF tried to resolve the boundary dispute by sending a proposed boundary line agreement to the adjacent parcel co-owners, i.e., Bisbee and Maurice Morris, on June 2, 1998. However, while Bisbee was willing to sign the agreement, he did not obtain the consent of co-owner Morris. Nor was Morris responsive when EMF's attorney contacted his attorney directly on the issue.

---

* The action was discontinued as against Rosenberg based upon Rosenberg's transfer of his interest in Lot 16 to Bisbee.

Another problem, pointed out in a letter Porco sent on March 11, 1998, was that Porco could not carry out his contractual obligation to construct a driveway on Lot 17 until a three-to-four-inch yard drain was installed; otherwise, due to possible water runoff problems, standing water would crack the driveway, creating possible violations, and potential difficulties with neighboring lot owners. However, Porco's March 11, 1998 letter reporting this problem did not indicate any desire to postpone the closing due to this concern.

Finally, an issue regarding ownership of the lots was raised by the title report, which indicated that at the time the parties had entered into the contract, the record owners of Lots 16 and 116 were Benjamin Rosenberg and Harry Cohen, respectively, not Bisbee. However, the lot ownership issue was resolvable, since Bisbee had actually received Harry Cohen's deed to Lot 116 in February 1998, although it was not recorded until May 1998 (after issuance of the title report), and since, in March 1999, Bisbee bought out Rosenberg's interest in Lot 16.

Plaintiff's attempts to resolve the boundary problem began on June 2, 1998, when plaintiff's counsel faxed to defendant's counsel the proposed boundary agreement, to no avail. In the months that followed, plaintiff's counsel periodically telephoned defendant's counsel in an effort to ascertain whether the agreement would be executed. After some time, EMF's attorney was informed of the name of the attorney for the co-owner of the encroaching lot, and he then contacted that attorney directly to ask whether the co-owner would be willing to sign the proposed boundary agreement, forwarding a copy of the document on July 7, 1999. However, the co-owner's attorney never responded.

No further steps were taken by plaintiff until the spring of 2000, when EMF's president notified its attorney that it would be willing to accept title to Lots 16 and 116 despite the encroachment affecting Lot 116. EMF's attorney made several telephone calls in an attempt to reach Bisbee's attorney, Lovitch, ultimately informing Lovitch that EMF wished to schedule a closing notwithstanding the encroachment problem. Lovitch responded that he would confer with his client, but then sent a letter dated March 31, 2000, returning the escrowed down payment and stating that in view of the two-year delay, the sellers no longer wished to proceed to closing.

EMF sent a "time of the essence" letter dated April 4, 2000, demanding specific performance and selecting April 22, 2000 as a closing date. Bisbee did not appear at the closing. Plaintiff

then commenced this action for specific performance, money damages (in the alternative), and reimbursement of legal fees, costs and expenses.

By appraisal dated January 13, 2003, Bisbee's appraiser valued Lots 16 and 116 at $85,000 each.

## DISCUSSION

*Abandonment*

■ Initially, we agree with the trial court that the contract remained in full force and effect for the two-year period in question. The trial court properly rejected defendant's contention that the contract was terminated by a letter dated August 3, 1998. As the court observed, even if the letter was sent, it failed to terminate the contract, since it does not reflect the taking of the necessary steps required by the contract to terminate it, such as the return of the down payment and the use of certified mail. Further, the trial court was also correct in its implicit rejection of defendant's position that his attorney's March 31, 2000 letter properly constituted a "reiteration" of the contract's cancellation.

The parties' contract therefore remained in effect absent a showing that the contract was dissolved due to the parties' abandonment of it.

> "A contract will be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior. That is, the refusal of one party to perform his contract amounts to an abandonment of it, leaving the other party to his choice of remedies, but his assent to abandonment dissolves the contract so that he can neither sue for a breach nor compel specific performance." (*Savitsky v Sukenik*, 240 AD2d 557, 559 [1997], quoting 91 NY Jur 2d, Real Property Sales and Exchanges § 146.)

Defendant contends that by failing to take action to enforce its rights under the contract, EMF abandoned the contract. However, the trial court rejected the assertion that the contract was abandoned, and that finding is supported by the evidence.

"To establish abandonment of a contract by conduct, it must be shown that the conduct is mutual, positive, unequivocal, and inconsistent with the intent to be bound" (*see Rosiny v Schmidt*, 185 AD2d 727, 732 [1992], *lv denied* 80 NY2d 762 [1992], citing *Benson v RMJ Sec. Corp.*, 683 F Supp 359 [1988]). Generally, a

finding of an abandonment will be based upon clear, affirmative conduct by at least one of the parties that is entirely at odds with the contract. In *Savitsky*, the plaintiff, the contract vendee of real property, was said to have evinced an intent to abandon the contract by her failure to take any steps to preserve her rights to purchase the property once she became aware of the owner's impending sale of the subject property to a third party (*supra* at 559). Thus, there, the seller took affirmative steps contrary to the contract, and the purchaser failed to object. In *Steven Strong Dev. Corp. v Washington Med. Assoc.* (303 AD2d 878 [2003]), a real estate developer, years after entering into an agreement to develop real property, conceded, in writing, the failure of the project and affirmatively waived the developer's fee. Its own action in writing that letter was an affirmative step inconsistent with enforcing its rights under the agreement, therefore constituting an abandonment (*id.*).

However, here there was no showing that EMF either took any affirmative steps inconsistent with the contract, nor that it acquiesced in any steps taken by Bisbee disaffirming the contract. The purported August 3, 1998 termination was a nullity, and defendant does not suggest that he took any other action inconsistent with the contract until March 31, 2000, *after* EMF's attorney contacted Bisbee's attorney, Lovitch, about closing on the contract despite the encroachment. For its part, through July 1999 EMF repeatedly took action in an attempt to resolve the encroachment problem so as to permit it to close on the contract, actively seeking Bisbee's and Morris's consent to the proposed boundary agreement. Therefore, the evidence shows only actions consistent with EMF's interest in the contract, and, finally, eight or nine months of inaction.

The mere lack of any communication between the parties for the period between July 1999 and March 2000 does not support a conclusion that EMF abandoned, or acquiesced to an abandonment of, the contract. Simply put, where the purchaser has taken numerous steps in an attempt to obtain its rights under the contract, and in the absence of any actions inconsistent with it, we view an eight-month silence as insufficient as a basis to dissolve the contract.

Inasmuch as the contract was not dissolved by virtue of abandonment, it remained in full force and effect, and, therefore, the question is whether, contrary to the trial court's conclusion, the buyer was entitled to specific performance of the contract.

*Specific Performance*

■ The elements of a cause of action for specific performance of a contract are that the plaintiff substantially performed its contractual obligations and was willing and able to perform its remaining obligations, that defendant was able to convey the property, and that there was no adequate remedy at law (*see Piga v Rubin*, 300 AD2d 68 [2002], *lv denied* 99 NY2d 646 [2003]).

EMF complied with all its contractual obligations. Initially, it forwarded the signed contract to Bisbee's counsel together with a $1,500 down payment check. When the title report timely obtained by EMF indicated an encroachment upon Lot 116 by a driveway on a neighboring lot, Lot 17, which was co-owned by Bisbee and nonparty Maurice Morris, EMF attempted a resolution of the problem by preparing a proposed boundary agreement which it submitted to Bisbee for signature. EMF's attorney then made periodic follow-up telephone calls to Bisbee's attorney, through July 7, 1999, regarding execution by both co-owners of the boundary agreement. Finally, in March 2000, pursuant to EMF's instruction, EMF's counsel contacted Bisbee's counsel to arrange the closing notwithstanding the encroachment affecting Lot 116. These facts demonstrate that EMF substantially performed its contractual obligations and was willing and able to perform its remaining obligations.

Although there was a dispute regarding the manner in which EMF was to fulfill its obligation under the contract to construct a driveway on Lot 17, this dispute was contractual in nature and did not constitute a title defect or interfere with the closing. Moreover, the president of EMF testified that he would have performed the driveway construction work as called for under the contract.

As to Bisbee's ability to convey title, any title irregularities which existed earlier do not affect plaintiff's right to specific performance, since the defects in title "disappeared [by] the time of the trial" (*see S.E.S. Importers v Pappalardo*, 53 NY2d 455, 465 [1981]). The remaining title defect, the encroachment problem, was not an impediment to Bisbee's ability to convey title once EMF announced that it was willing to accept something less than marketable title, and to close on such terms (*see e.g. Regan v Lanze*, 40 NY2d 475, 482 [1976]).

While not disagreeing with any of the foregoing, the trial court concluded, in its position as a court of equity, that both parties came to court with unclean hands, and that the relief of

specific performance would provide a windfall to EMF in view of the enormous increase in the value of the property. We conclude, to the contrary, that no equitable consideration warrants the denial of specific performance here.

Generally, the equitable remedy of specific performance is routinely awarded in contract actions involving real property, on the premise that each parcel of real property is unique (*see* 3 Dobbs, Remedies § 12.11 [3], at 299 [Practitioner's 2d ed]). The court has discretion to deny such relief "as equity and justice seem to demand in the light of the circumstances of each case" (91 NY Jur 2d, Real Property Sales and Exchanges § 204), and the available equitable defenses include serious unfairness, undue hardship, and laches, or unreasonable prejudicial delay (*see* 3 Dobbs, Remedies, *supra* at 302). But, "the court's discretion to grant or deny specific performance of a contract for the sale of realty is not unlimited; unless the court finds that granting a decree of specific performance would be a drastic or harsh remedy, or work injustice, the court must direct specific performance" (91 NY Jur 2d § 204, *supra*).

At the outset, it bears emphasis that there was no unfairness in the deal itself; the contract was fair when entered into. Yet, the passage of time before this action was commenced and the property's increase in value require consideration of a number of rules and cases.

A common fact pattern in which specific performance is denied is discussed in Dobbs's treatise on the law of remedies:

> "*The speculating land buyer.* One of the most common patterns in denying specific performance is the case in which the buyer has contracted in a way that permits him to postpone purchase for a long period for which he has paid no option price. For instance, the buyer may find title defects which give him the right to seek a cure and delay performance accordingly. Or he may obtain extensions for various reasons. If the seller concludes that the buyer has abandoned the contract or breached it and refuses to perform, the buyer may wait for long period before suing for specific performance in order to determine whether the land will increase in value. Any of these devices may be used by buyers as means of getting what in effect is a free option; if the price rises, the buyer will eventually sue for specific performance. If it does not, the buyer drops

the deal. Many of the doctrines—unfairness, hardship, laches—are invoked in just such cases to defeat the buyer's attempt to get a free ride by denying specific performance." (3 Dobbs, Remedies, *supra* at 302-303.)

In other words, where it is established that the buyer has made excuses in order to delay closing on the contract, with an actual purpose of waiting to see whether to enforce the contract depending upon whether the market value of the subject property increases or decreases, the courts will not grant specific performance.

However, in the present case, although the value of the property increased, the trial court did not find that EMF was behaving in any sort of disingenuous or manipulative fashion, or using insignificant title defects for the purpose of delaying the purchase in order to see whether the market value of the property went up or down. Rather, plaintiff was legitimately attempting to resolve the real defects in title so as to effectuate the purchase. Furthermore, while the 2003 valuation of the property is undisputed, there was no evidence showing what the property's value was at the time plaintiff commenced the action, and so there is no basis to conclude that plaintiff's decision in March 2000 to take action to enforce the contract was based upon an increase in value.

Unconscionable delay in prosecuting one's rights is also a ground for denying equitable relief, when the defendant was prejudiced thereby (*see Eastern Shopping Cts. v Trenholm Motels*, 33 AD2d 930, 932 [1970]). The plaintiff in *Eastern Shopping Centers* had sold property to the defendant with an option to purchase the property back for the contract price if the defendant did not start construction of a motel and restaurant on the property by January 1, 1965. Because the plaintiff waited over 3$^1$/$_2$ years, knowing that construction had not begun, while the defendant meanwhile expended substantial sums on the development and improvement of the property—and while the property increased in value—the Court found that the defense of laches was established (*id.*).

The delay at issue in the present case was neither so long nor so "unconscionable." When we factor in the reasonable attempts to resolve the boundary issue involving a nonparty to the transaction, the period attributable to unexplained inaction is limited to eight or nine months, a period short enough to be explained by the parties' attention being focused on other business mat-

ters. Moreover, unlike the defendant in *Eastern Shopping Centers*, Bisbee presented no evidence to show that he was prejudiced by EMF's delay in seeking enforcement of the contract. He merely showed that the value of the property appreciated substantially by the time of trial; this alone does not constitute such prejudice.

While a substantial increase in value combined with an unreasonable delay has also been held to warrant denying specific performance on grounds of laches, the delay here does not warrant application of that reasoning. In *Groesbeck v Morgan* (206 NY 385 [1912]), specific performance was denied because the purchaser took no action to seek enforcement of his rights under the contract until almost five years from the time all hurdles to conveyance had been removed by the seller. It is interesting to note that in *Groesbeck*, it took the seller 15 months after entering into the contract to actually acquire the fee (when he entered into the contract, he merely had a lien) and to clear all other liens and encumbrances on the property; this portion of the delay between the contract date and the action's commencement date was not considered by the Court. However, the buyer's failure to take action to enforce his rights under the contract, once aware that the seller had acquired clear title, for an additional four years and nine months, during which time the value of the property had increased from $2,750 to $15,000, was considered proper grounds for denying specific performance (*id.*).

Here, as in *Groesbeck*, a portion of the delay between contract and commencement of the action is irrelevant because it is attributable to attempts to clear title. The relevant portion of the delay in this case is just the eight or nine months in which nothing was done. We have already determined that this same nine-month delay does not constitute an abandonment such as would create a dissolution of the contract. We now conclude that it does not establish a laches defense.

*Groesbeck* reiterated the centuries-old common-law equitable defense of laches, that "[w]hen the lapse of time is occasioned or accompanied[ ] by a refusal or a failure to claim or act under the contract, and is *so great or of such characteristics as to amount to a waiver or abandonment of the contract*, the party who comes not into court until after such delay, will have forfeited all claim to equity" (*Merchants' Bank v Thomson*, 55 NY 7, 12 [1873] [emphasis added]). However, there is a vast difference between the nine-month delay here and the four-year-

and-nine-month delay in *Groesbeck*: the nine-month delay is simply too short to be "so great or of such characteristics as to amount to a waiver or abandonment of the contract," as *Merchants' Bank* defines the defense. The defense of laches was not established here.

As to the enormous increase in value between the contract date in March 1998 and the January 2003 valuation date, we decline to rely upon it *alone* as a proper basis for denying specific performance. While "[s]pecific performance . . . will not be granted where it would result in injustice or inequity" (Shipley, *Change of Conditions After Execution of Contract or Option for Sale of Real Property as Affecting Right to Specific Performance,* 11 ALR2d 390, § 1), the increase in market value of the property does not in itself create injustice or inequity.

Indeed, many treatises explain that an increase in value of the property between the time the contract is entered into and the time when specific performance is sought, in and of itself, would not normally be sufficient ground for denying specific performance (*see* Shipley, 11 ALR 2d 390, *supra*; 91 NY Jur 2d, Real Property Sales and Exchanges § 207), although "such an increase, *taken together with a delay or default on the part of the purchaser, may justify equity in refusing to aid him,*" especially where "the delay was a speculative one occasioned by the hope of just such an increase" (91 NY Jur 2d, *supra* [emphasis added]). Having already determined that the relatively minor delay on plaintiff's part was not a speculative one and did not justify a refusal of equitable relief, we are left only with what is admittedly an enormous increase in value by January 2003.

As between the two parties, it is EMF, as the contract vendee, that is entitled to benefit from the increase in the value of the property. This is so since the vendee in a contract to sell real estate is viewed by the law as the equitable owner of the property, while the vendor is viewed as holding title merely as security for the payment of the agreed purchase price (*see Garfein v McInnis*, 223 App Div 28, 30 [1928], *affd* 248 NY 261 [1928], citing *Matter of City of New York*, 138 App Div 203, 207 [1910], *affd* 199 NY 560 [1910]).

That plaintiff waited some eight or nine months before taking action to enforce the contract, notwithstanding the encroachment problem, does not successfully establish an equitable defense. There is no adequate remedy at law in this case, in light of the fluctuating market values and the unique nature of this real estate, to remedy EMF's loss of the benefit of its

bargain. Therefore, we reverse the IAS court and find that EMF has established a right to specific performance.

Accordingly, the judgment of the Supreme Court, Bronx County (Howard Silver, J.), entered August 11, 2003, which, after a nonjury trial, dismissed plaintiff's cause of action for specific performance, awarded plaintiff $25,000 in damages with interest from April 22, 2000, and directed defendant to return plaintiff's $1,500 down payment check, should be reversed, on the law and the facts, with costs, the award of damages vacated, judgment granted on plaintiff's cause of action for specific performance, and the matter remanded for further proceedings consistent herewith. Cross appeals from a decision of the same court and Justice, dated May 13, 2003, as amended May 21, 2003, should be dismissed, without costs, as taken from nonappealable paper.

BUCKLEY, P.J., ANDRIAS, WILLIAMS and GONZALEZ, JJ., concur.

Judgment, Supreme Court, Bronx County, entered August 11, 2003, reversed, on the law and the facts, with costs, the award of damages vacated, judgment granted on plaintiff's cause of action for specific performance, and the matter remanded for further proceedings consistent herewith. Cross appeals from a decision of the same court, dated May 13, 2003, as amended May 21, 2003, dismissed, without costs, as taken from nonappealable paper.