C3 MEDIA & MARKETING GROUP, LLC, Plaintiff,

v.

FIRSTGATE INTERNET, INC., Firstgate Internet AG, Webpay International AG, Webpay Inc., Norbert Stangl and Fabian Siegel, Defendants.

No. 04 Civ. 9508(WHP).

United States District Court, S.D. New York.

Sept. 26, 2005.

422

Clyde Mitchell, Gilbert de Dios, Claugus & Mitchell, New York, NY, for Plaintiff.

Marcus A. Ernst, Stephen B. McNally, Wuersch & Gering LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiff C3 Media & Marketing Group, LLC ("C3 Media" or "Plaintiff") brings this action against FirstGate Internet, Inc. ("FirstGate"), Webpay Inc. ("Webpay"), their foreign parent corporations and two of their officers and directors (collectively, "Defendants"). Plaintiff claims that Defendants failed to perform their obligations under three separate contracts and evaded their creditors. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) arguing that C3 Media previously released Defendants from liability. Defendants also move to dismiss the claims against the foreign parent corporations and defendant Norbert Stangl ("Stangl") for improper service of process. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

C3 Media is a marketing and sales consulting company that specializes in media and technology industries. (Amended Complaint, dated Feb. 2, 2005 ("Compl.") ¶ 5.)[1] FirstGate and Webpay are United

---

1. Plaintiff filed its Amended Complaint after Defendants filed their motion. Because a Rule 12(b) motion is not a responsive pleading, C3 Media was entitled to amend the Complaint without leave of the Court. *See* Fed.R.Civ.P. 15(a); *Barbara v. New York Stock Exch., Inc.*, 99 F.3d 49, 56 (2d Cir.1996).

States corporations that provide billing and payment services to companies selling digital content over the Internet. (Compl.¶¶ 6, 9.) FirstGate Internet AG ("FirstGate AG") is the German parent corporation of FirstGate. (Compl.¶¶ 6–7.) Plaintiff alleges that, from its inception in 2002, FirstGate has been undercapitalized and closely controlled by its parent corporation, such that "[t]he operation and daily activities of [FirstGate] are in effect a mere department or office of [FirstGate AG], rather than an independent subsidiary company." (Compl. ¶ 13.) Webpay International AG ("Webpay AG") is the Swiss parent corporation of Webpay. (Compl.¶¶ 8–9.) The Complaint alleges that Webpay AG operates Webpay in much the same way that FirstGate AG operates its United States subsidiary. (Compl.¶¶ 93–97.) In early 2004, Webpay AG became the parent corporation of FirstGate AG as well. (Compl.¶¶ 7, 20.) Defendants Fabian Siegel ("Siegel") and Stangl are directors and/or executive officers of each of the corporate defendants. (Compl.¶¶ 10–11.)[2]

On December 12, 2002, C3 Media and FirstGate AG entered a contract pursuant to which C3 Media would provide consulting and marketing services and FirstGate AG would share the net revenue attributable to new FirstGate customers (the "Consulting Agreement"). (Compl. ¶ 14 & Ex. 3.) Plaintiff alleges that FirstGate AG failed to perform. (Compl.¶ 14.)

Coincident with its consulting and marketing responsibilities, C3 Media began to play a management role in FirstGate. (Compl.¶ 15.) This arrangement was formalized in a June 4, 2003 contract (the "Management Agreement"), which Siegel signed for FirstGate, FirstGate AG and on his own behalf. (Compl. ¶ 15 & Ex. 4.) Pursuant to the Management Agreement, C3 Media's George Cain ("Cain") and W. Edward Burrell ("Burrell") became executive officers of FirstGate. (Compl.Ex. 4.) The Management Agreement further provided that C3 Media would receive a monthly retainer and, if certain benchmarks were achieved, an equity interest in FirstGate. (Compl.Ex. 4.) Plaintiff alleges that FirstGate AG did not pay the full retainer, reimburse C3 Media's investments or provide the equity interest. (Compl.¶¶ 16, 21.)

On August 28, 2003, Stangl sent Cain and Burrell an email stating that FirstGate AG was temporarily freezing its U.S. investments. (Compl. ¶ 18 & Ex. 6.) Nonetheless, Stangl promised that FirstGate would continue to operate until January 2004 and personally guaranteed that Cain's and Burrell's salaries would be paid until then. (Compl.Ex. 6.) Stangl confirmed those promises in a subsequent telephone conversation. (Compl.¶ 19.)

Thereafter, the outstanding shares of FirstGate AG were transferred to Webpay AG. (Compl.¶ 21.) In May and June 2004, in a telephone conversation and at a meeting of Webpay AG affiliates, "Stangl represented to C3 Media that [FirstGate AG] had $2.5 million in the bank, and that [FirstGate AG] and Webpay AG would continue their support of [FirstGate] and would advance an additional $50,000 per month." (Compl. ¶ 24; *see* Compl. ¶ 72.)

**2.** The Complaint alleges that Siegel and Stangl are directors of FirstGate, FirstGate AG and Webpay, with Stangl sitting as the Chairman for FirstGate. (Compl.¶¶ 10–11.) Siegel is Chief Executive Officer of FirstGate and Chief Technology Officer of Webpay AG. (Compl.¶ 11.) Stangl is the Chief Executive Officer of FirstGate AG and Webpay AG. (Compl.¶ 10.) In addition, Stangl is "the largest and controlling stockholder of Webpay AG" and was the controlling shareholder of FirstGate AG prior to Webpay AG's 2004 acquisition. (Compl.¶ 10.)

Plaintiff alleges that, unbeknownst to C3 Media, at the time of his representation "Stangl had begun the process of forming [Webpay], which would in essence continue the business of [FirstGate], in order to cut C3 Media's claims." (Compl.¶ 26.)

On July 22, 2004, in reliance on Stangl's representation, Plaintiff and Cain entered an agreement with FirstGate to terminate C3 Media's consulting and management services (the "Separation Agreement"). (Compl. ¶¶ 22, 72, 80 & Ex. 7.) The agreement contained a release of any claims C3 Media then had against FirstGate "and its officers, directors, executives, shareholders ... and affiliates" (the "Release"). (Compl. Ex. 7 § 3.) In consideration thereof, FirstGate agreed to pay $135,000 in monthly installments of $11,250 plus interest, along with certain fees and commissions. (Compl. Ex. 7 § 2.) The Separation Agreement provides that C3 Media may accelerate the entire outstanding balance if any "payment is not made within 20 days of its due date." (Compl. Ex. 7 § 2.) The first payment was due on August 1, 2004 and the last on July 1, 2005. (Compl. Ex. 7 § 2.)

FirstGate failed to make the first payment. (Compl.¶ 25.) On August 20, 2004, C3 Media accelerated the full $135,000 obligation. (Compl.¶ 25.) Again, FirstGate did not pay. (Compl. ¶¶ 25, 28.) On August 26, 2004, counsel for FirstGate sent Cain a letter informing him that FirstGate failed to make the payments because it was no longer financially supported by FirstGate AG. (Compl. ¶ 26 & Ex. 8.) The letter invited Cain to "discuss the situation" with FirstGate's counsel. (Compl.Ex. 8.)

Webpay was incorporated in August 2004. (Compl.¶ 29.) The company occupies FirstGate's offices, employs the same staff and provides the same services for the same clients. (Compl.¶¶ 9, 29.) In September and October 2004, all of FirstGate's assets were transferred without consideration to Webpay and others. (Compl.¶¶ 33–34.) Additionally, the Complaint alleges, FirstGate AG and Webpay AG diverted to Webpay revenue they received for work performed by FirstGate. (Compl.¶ 32.)

C3 Media commenced this action on December 3, 2004. Plaintiff claims that the Release is not binding, asserts nine causes of action and seeks nearly $1 million in damages. Plaintiff alleges that FirstGate and FirstGate AG breached the Consulting, Management and Separation Agreements and that Siegel and Stangl breached the Management Agreement. (Compl.¶¶ 38–61.) C3 Media further claims that all Defendants are liable under quantum meruit for the services it provided. (Compl.¶¶ 62–68.) The Complaint also alleges that Stangl fraudulently induced C3 Media to enter the Separation Agreement and Defendants fraudulently attempted to avoid FirstGate's obligations under that contract. (Compl.¶¶ 69–81.) In connection with this same conduct, C3 Media claims that Siegel and Stangl breached their fiduciary duties to FirstGate's creditors. (Compl.¶¶ 102–18.) Finally, Plaintiff asserts claims against FirstGate AG to pierce the corporate veils between them and their subsidiaries. (Compl.¶¶ 82–101.)

Defendants move to dismiss the claims against Stangl, FirstGate AG and Webpay AG on the ground that service of process was not properly effected on those defendants.[3] Defendants also move pursuant to

---

**3.** Defendants cite Rule 12(b)(6) as the procedural authority for their motion. However, a motion "challeng[ing] the mode or lack of delivery of a summons and complaint" is properly made under Rule 12(b)(5). *Blue Ocean Lines v. Universal Process Equip., Inc.*,

Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the entire Complaint for failure to state a claim, contending that the Release remains valid and enforceable and precludes C3 Media's claims.

## DISCUSSION

### I. Service of Process

▮▮▮ When confronted with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(5) for insufficient service of process, the burden to show that service was adequate rests with the plaintiff. *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, No. 04 Civ. 0604(CSH), 2004 WL 1781009, at *4 (S.D.N.Y. Aug.10, 2004); *Int'l Cultural Prop. Soc'y v. Walter de Gruyter & Co.*, No. 99 Civ. 12329(BSJ), 2000 WL 943319, at *1 (S.D.N.Y. July 6, 2000). "Conclusory statements" that service was properly effected are insufficient to carry that burden. *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp. 654, 658 (S.D.N.Y. 1997). A plaintiff may rely on specific allegations in the complaint to create a *prima facie* showing of facts that would dictate the appropriate means of service. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.1998); *Int'l Cultural Prop. Soc'y*, 2000 WL 943319, at *1. But in resolving the motion, the court "must look to matters outside the complaint" to determine what steps, if any, the plaintiff took to effect service. *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F.Supp.2d 382, 387 (S.D.N.Y.2002).

### A. FirstGate AG and Webpay AG

▮▮▮ FirstGate AG and Webpay AG are foreign corporations. Because service on a foreign corporation requires the transmittal of a judicial document abroad, *see* N.Y. Bus. Corp. Law § 307, the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, applies and preempts contrary state law. *Darden*, 191 F.Supp.2d at 387; *see Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). However, a plaintiff need not comply with the Hague Convention if the foreign corporation has a domestic subsidiary that "is so dominated by the foreign parent as to be a 'mere department'" thereof. *Int'l Cultural Prop. Soc'y*, 2000 WL 943319, at *1; *see Taca Int'l Airlines, S.A. v. Rolls–Royce of Eng., Ltd.*, 15 N.Y.2d 97, 102, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965); *Van Wert v. Black & Decker Inc.*, 246 A.D.2d 773, 775, 667 N.Y.S.2d 770, 772 (3d Dep't 1998). In making this determination, courts must consider four factors: (1) common ownership; (2) the subsidiary's financial dependency on the parent; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) the degree of control exercised by the parent. *Jazini*, 148 F.3d at 185 (internal quotation omitted).

According to the affidavits of service, C3 Media's process server delivered copies of the Summons and Complaint to the offices of FirstGate and Webpay at 55 Broad Street in Manhattan and left them with Ossip Kaehr on December 3, 2004. (Affidavits of Bobby Ali, dated Dec. 6, 2004.) Those affidavits also establish that on December 6, 2004, copies of the Summons and Complaint were mailed to 55 Broad Street. (Affidavits of Bobby Ali, dated

---

No. 93 Civ. 1722(SS), 1993 WL 403961, at *4 (S.D.N.Y. Oct.7, 1993). This Court treats that

aspect of Defendants' motion accordingly.

Dec. 6, 2004.) Defendants do not dispute that Ossip Kaehr is a person of suitable age and discretion and an officer of Webpay and FirstGate, which have their offices at 55 Broad Street. (Defendant's Memorandum in Support of Motion to Dismiss, dated Jan. 18, 2005 at 19.)

Plaintiff has alleged that both FirstGate AG and Webpay AG completely controlled their wholly owned U.S. subsidiaries by making the subsidiaries dependent on their "hand-to-mouth advances" of capital and dictating what work they performed. (Compl.¶¶ 83–84, 86, 93–94, 96.) Moreover, Plaintiff alleges that FirstGate AG via FirstGate, and Webpay AG via Webpay, ignored corporate formalities because, *inter alia*, their boards conducted simultaneous meetings and the companies held assets jointly. (Compl.¶¶ 85, 95.) Thus, Plaintiff has made a *prima facie* showing that FirstGate and Webpay are "mere departments" of their foreign parent corporations and that service was properly effected on the parents through their subsidiaries. *Cf. Jazini,* 148 F.3d at 185 ("The Jazinis' allegations that Nissan U.S.A. is a 'mere department' of Nissan Japan lack the factual specificity necessary to confer jurisdiction."). Defendants having failed to submit any evidence to rebut this *prima facie* showing, Defendants' Rule 12(b)(5) motion to dismiss the claims against FirstGate AG and Webpay AG is denied.

### B. *Stangl*

An individual may be served in New York "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business ... of the person to be served and ... by mailing the summons by first class mail to the person to be served at his or her actual place of business," provided the two components are effected "within twen-ty days of each other." N.Y. C.P.L.R. § 308(2); *see Vid v. Kaufman,* 282 A.D.2d 739, 739–40, 724 N.Y.S.2d 756, 757 (2d Dep't 2001); *see also* Fed.R.Civ.P. 4(e) (service may be effected "pursuant to the law of the state in which the district court is located"). Plaintiff alleges that Stangl's place of business was 55 Broad Street and the Complaint includes documentary evidence that Stangl's email signature listed "55 Broad Street" as his place of business and that he maintained a telephone extension at that address. (Compl. Ex. 1, Emails I, L.) Once again, Defendants have offered no evidence to rebut Plaintiff's *prima facie* case that Stangl's actual place of business is 55 Broad Street, where C3 Media's process server both delivered and mailed a copy of the summons and complaint.

Accordingly, Defendants' Rule 12(b)(5) motion to dismiss the claims against Stangl is denied.

### II. *Effect of the Release*

#### A. *Standard on a Rule 12(b)(6) Motion to Dismiss*

On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 89–90 (2d Cir. 2004). A court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. *See In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 69 (2d Cir.2001). The issue on a motion to dis-

miss is not "whether plaintiff will prevail, but simply whether she is entitled to offer evidence to support her claims." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 788 (2d Cir.2002).

In resolving a motion to dismiss for failure to state a claim, a court may consider the complaint as well as "documents appended to the complaint or incorporated in the complaint by reference." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002). Such documents are deemed part of the pleading. *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991).

## B. *The Release*

■■ As an initial matter, even if the Release remains effective, it does not preclude C3 Media from raising all claims asserted in this action. By executing the Separation Agreement, C3 Media discharged, in pertinent part:

> [A]ny and all claims . . . of whatever kind or nature in law, equity or otherwise, whether known or unknown, suspected or unsuspected, which [C3 Media] . . . now has, owns or holds, or has at any time heretofore had, owned or held . . . arising out of or in any way connected with [C3 Media's] . . . consulting relationship with [FirstGate], its subsidiaries, predecessors or affiliates, or any event occurring or state of facts existing on or before the date of this Agreement, including, without limitation, any claims for . . . unpaid wages, salary or incentive payment, breach of contract . . . [or] tort.

(Compl. Ex. 7 § 3.) The Release does not apply to "any liabilities and obligations that [the Separation Agreement] expressly creates," or any claims that accrue after the date of the Agreement, (Compl. Ex. 7 § 3.) Accordingly, even if Defendants can enforce the Release, it does not preclude claims for breach of the Separation Agreement and fraudulent inducement, which cannot be released. *See Skylon Corp. v. Guilford Mills, Inc.*, 864 F.Supp. 353, 358 (S.D.N.Y.1994) (a release can be set aside if procured by fraud). Moreover, because they are based on events subsequent to the execution of the Separation Agreement, C3 Media's claims for fraud, breach of fiduciary duty and piercing the corporate veil are unaffected by the Release although, as discussed below, Defendants contend that they are redundant of the claims for breach of the Separation Agreement. Thus, if enforceable, the Release would only bar Plaintiff's claims for breach of the Consulting and Management Agreements and quantum meruit.

■■ New York law governs the Separation Agreement. (Compl. Ex. 7 § 14.) *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir.2000) (applying New York law because "[t]he Agreement in question contained a choice of law provision, and as a general rule, choice of law provisions are valid and enforceable in New York" (internal quotation and alteration omitted)). Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Allen*, 945 F.2d at 44 (internal quotation omitted). However, a release is treated just as any other contract, *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir.2001); *Metz v. Metz*, 175 A.D.2d 938, 939, 572 N.Y.S.2d 813, 815 (3d Dep't 1991), and may be set aside on the traditional bases of fraudulent inducement, misrepresentation, mutual mistake or duress, *Allen*, 945 F.2d at 44; *Knoll v. Equinox Fitness Clubs*, No. 02 Civ. 9120(SAS), 2003 WL 23018807, at *6 (S.D.N.Y. Dec.22, 2003).

C3 Media argues three grounds for rescission of the Separation Agreement and

invalidation of the Release: (1) fraudulent inducement; (2) mutual repudiation and abandonment; and (3) material breach. Defendants contend that the Complaint fails to allege sufficiently any of C3 Media's purported bases for rescission and, therefore, this Court must enforce the Release and dismiss Plaintiff's claims.

### 1. *Fraudulent Inducement*

▮▮▮▮▮ C3 Media claims that Defendants fraudulently induced it to enter the Separation Agreement, rendering the Release unenforceable. Specifically, C3 Media alleges that in May and June 2004, Stangl represented to Cain both in a telephone conversation and at a meeting that FirstGate AG "had $2.5 million in the bank, and that [FirstGate AG] and Webpay AG would continue their support of [FirstGate] and would advance an additional $50,000 per month" to the company. (Compl. ¶ 24; *see* Compl. ¶ 72.) Plaintiff alleges that "Defendants never intended to pay C3 Media the $135,000." (Compl. ¶ 77.) Plaintiff claims that Stangl, as an officer and/or director of each corporate entity, knew his representations were false because Defendants (1) had already begun the process of forming Webpay and (2) soon thereafter dismantled FirstGate to fraudulently avoid the company's obligations under the Separation Agreement. (Compl. ¶¶ 74–76.) Defendants challenge this claim as duplicative and indistinguishable from Plaintiff's claims for breach of the Separation Agreement.[4]

▮▮▮▮▮ It is well settled under New York law that a party cannot maintain a claim for fraud predicated on a breach of contract merely by alleging that the breaching party never intended to perform. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275, 743 N.Y.S.2d 870, 871 (1st Dep't 2002); *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 528, 724 N.Y.S.2d 66, 67–68 (2d Dep't 2001); *Caniglia v. Chi. Tribune–New York News Syndicate, Inc.*, 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 (1st Dep't 1994). Rather, to state a fraud claim coexistant with an alleged breach of contract, a plaintiff must: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citations omitted); *accord Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F.Supp.2d 419, 425 (S.D.N.Y.2004); *Saleemi v. Pencom Sys. Inc.*, No. 99 Civ. 667(DLC), 2000 WL 640647, at *4 (S.D.N.Y. May 17, 2000).

With respect to FirstGate and FirstGate AG, C3 Media does not plead special damages. *See Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026(WHP), 2002 WL 24305, at *6 (S.D.N.Y. Jan.8, 2002) (" 'Special' or 'consequential' damages seek to compensate a plaintiff for losses other than the value of the promised performance that are incurred as a result of the

---

4. Defendants also contend that the Complaint fails to plead fraud with particularity. Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993). As the above recitation of C3 Media's fraud allegations reflects, the Complaint adequately alleges each of these elements with sufficient particularity.

defendant's breach" and "must be plead with particularity."). However, Plaintiff contends that Defendants breached an independent duty and that Stangl's misrepresentations were collateral to the Separation Agreement. This Court addresses those arguments in turn.

### a. *Independent Duty*

 C3 Media argues that Stangl, as a director of FirstGate, owed the company's creditors a fiduciary duty once FirstGate became insolvent. However, FirstGate is only alleged to have become insolvent in August or September of 2004, *after* the Separation Agreement was entered and *after* Stangl's alleged misrepresentations. (Compl. ¶ 75.) An officer or director "does not owe a fiduciary duty to the creditors of a solvent corporation." *Semi–Tech Litig., L.L.C. v. Ting*, 13 A.D.3d 185, 188, 787 N.Y.S.2d 234, 236 (1st Dep't 2004) (citing *Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 (2d Cir.1981)); *see Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549, 708 N.Y.S.2d 26, 729 N.E.2d 683 (2000) ("[O]fficers and directors of an *insolvent* corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors." (emphasis added)); *see also Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 788 (Del.Ch.1992) ("[I]t is the fact of insolvency which causes the duty to creditors [to] arise."). Since Stangl owed no fiduciary duty to FirstGate's creditors at the time he made the alleged misrepresentations, C3 Media has not alleged an independent duty to support its claim of fraudulent inducement.

 Defendants also contend that C3 Media's claims of breach of fiduciary duty and fraud overlap impermissibly with the alleged breach of the Separation Agreement. However, because these claims concern events after FirstGate became insolvent, Plaintiff adequately alleges that Siegel and Stangl had an independent duty at that time. Accordingly, Plaintiff's claims against Siegel and Stangl for breach of fiduciary duty and fraud are sufficiently distinct from its claims for breach of contract.

 Moreover, to the extent Plaintiffs assert claims against Webpay and Webpay AG for fraud or piercing the corporate veil, those claims are not redundant of Plaintiffs' claims for breach of the Separation Agreement. The rule barring fraud claims that sound in contract "only applies where the defendant against whom the fraud claim is asserted has a contractual relationship with the plaintiff." *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, No. 00 Civ. 9214(RWS), 2003 WL 1751780, at *8 (S.D.N.Y. Apr.1, 2003) (citing *La Barte v. Seneca Res. Corp.*, 285 A.D.2d 974, 975, 728 N.Y.S.2d 618, 621 (4th Dep't 2001)). However, Plaintiff's claims of fraudulent inducement against Webpay, Webpay AG, Siegel and Stangl must be dismissed because those defendants were not parties to the Separation Agreement. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Worley*, 257 A.D.2d 228, 233, 690 N.Y.S.2d 57, 61 (1st Dep't 1999) ("Fraud by a third party is not effective to vitiate contractual obligations.").

### b. *Collateral or Extraneous Misrepresentation*

 Only a misrepresentation regarding a present fact may give rise to a claim for fraudulent inducement separate and apart from a breach of contract claim. *See Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986); *Sabo v. Delman*, 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); *First Bank of Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21

(1st Dep't 1999); *Orix Credit Alliance, Inc. v. R.E. Hable Co.*, 256 A.D.2d 114, 115, 682 N.Y.S.2d 160, 161 (1st Dep't 1998); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir.1992); *VTech Holdings Ltd. v. Lucent Techs. Inc.*, 172 F.Supp.2d 435, 439 (S.D.N.Y.2001). By contrast, a misrepresentation concerning a party's intention not to perform its obligations under a contract "is no different from the commonly presumed intention either to perform or to pay damages for breach of contract, and should be penalized no more extensively." *Great Earth*, 311 F.Supp.2d at 427; *see also Rolls–Royce Motor Cars, Inc. v. Schudroff*, 929 F.Supp. 117, 123 (S.D.N.Y.1996) (noting "the slippery distinction between a misrepresentation of present fact and a misrepresentation of future intent"). As such, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Sudul v. Computer Outsourcing Servs.*, 868 F.Supp. 59, 62 (S.D.N.Y.1994).

Reading the pleadings in the light most favorable to Plaintiff, the Complaint alleges that Stangl, acting on his own behalf and on behalf of each of the corporate defendants except Webpay, represented to C3 Media that FirstGate's financial wherewithal was secure. Although the Complaint describes a misrepresentation as to future acts—*i.e.*, that FirstGate AG and Webpay AG *"would continue* their support of [FirstGate] and *would advance* an additional $50,000 per month" (Compl. ¶ 24 (emphasis added))—it requires no great semantic leap to construe this statement as pertaining to a present fact: FirstGate's financial stability. *See Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94, 495 N.Y.S.2d

309, 485 N.E.2d 974 (1985) ("The undenied statement that defendants were told that they had the line of credit was a representation of present fact, not of future intent.").

Where, a party obligates itself to a payment of money, a representation concerning that party's ability to pay is indivisible from the contract. *See Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101(SHS), 2004 WL 1574629, at *11–12 (S.D.N.Y. July 14, 2004) (holding that a misrepresentation concerning a party's ability to perform a contract "in essence is merely a promise to perform under the contract . . . and is not actionable in fraud"). A contracting party's representations about its resources "underscore [that party's] purported intention and ability to perform the contract . . . [and] are simply part and parcel of the intention to perform." *Crabtree v. Tristar Auto. Group, Inc.*, 776 F.Supp. 155, 163 (S.D.N.Y.1991); *accord John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, No. 99 Civ. 9905(SHS), 2001 WL 910405, at *4 (S.D.N.Y. Aug.13, 2001). Because Stangl's representations about FirstGate's financial security merely buttress its contractual promise to pay the installments required by the Separation Agreement, C3 Media's fraudulent inducement claims are redundant of its claims for breach of the Separation Agreement and must be dismissed. Likewise, Plaintiff's claims against FirstGate and FirstGate AG for fraud and piercing the corporate veil merely duplicate its claims against those defendants for breach of the Separation Agreement.

As such, Plaintiff may not void the Release on the basis of fraudulent inducement. However, C3 Media also pleads a claim for rescission of the Separation Agreement based on either the parties'

mutual repudiation and abandonment or Defendants' material breach.

### 2. *Mutual Repudiation and Abandonment*

 "A contract will be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior." *EMF Gen. Contracting Corp. v. Bisbee,* 6 A.D.3d 45, 49, 774 N.Y.S.2d 39, 43 (1st Dep't 2004); *accord Graham v. James,* 144 F.3d 229, 238 (2d Cir.1998) ("[A]bandonment of a contract can be accomplished only through mutual assent of the parties, as demonstrated by positive and unequivocal conduct inconsistent with an intent to be bound."); *Jones v. Hirschfeld,* 348 F.Supp.2d 50, 59 (S.D.N.Y.2004). In such a circumstance, the other party's "assent to abandonment dissolves the contract so that he can neither sue for a breach nor compel specific performance." *EMF,* 774 N.Y.S.2d at 43; *see Savitsky v. Sukenik,* 240 A.D.2d 557, 559, 659 N.Y.S.2d 48, 50 (2d Dep't 1997). "[T]he party asserting rescission or abandonment has the burden of proving it." *Graham,* 144 F.3d at 238; *accord Paine-Webber Inc. v. Campeau Corp.,* 670 F.Supp. 100, 107 (S.D.N.Y.1987); *Rosiny v. Schmidt,* 185 A.D.2d 727, 732, 587 N.Y.S.2d 929, 932 (1st Dep't 1992).

 Plaintiff contends that Defendants abandoned the Separation Agreement by failing to make any payments and conceding their inability to pay. However, contrary to C3 Media's characterization, the August 26th letter from FirstGate's counsel clearly acknowledges that FirstGate had a continuing obligation under the agreement and invited C3 Media to discuss a resolution of its delinquency. A party's efforts to negotiate through a breach of contract reflect an intent to honor the contract not abandon it. *See EMF,* 774 N.Y.S.2d at 43. Moreover, even if Defendants' conduct .evidences abandonment, Plaintiff has alleged no facts to demonstrate that it acquiesced to Defendants' abandonment. Rather, upon Defendant's alleged breach, C3 Media promptly brought this action, in part, to enforce the Separation Agreement. *Cf. EMF,* 774 N.Y.S.2d at 43 (a party cannot sue for breach of contract if he acquiesces to the other party's abandonment); *Savitsky,* 659 N.Y.S.2d at 50 (noting that failure to enforce one's rights or remedy the other side's breach indicates acquiescence).

Accordingly, C3 Media has failed to plead facts that would establish mutual abandonment and justify this Court's rescission of the Separation Agreement on that ground.

### 3. *Defendants' Material Breach*

Finally, C3 Media contends that the Separation Agreement is an executory accord which Defendants materially breached by failing to make any payments thereunder. Plaintiff argues that Defendants' material breach permits it to sue on the underlying obligations and warrants rescission of the Separation Agreement. Defendants respond that, although they breached the Separation Agreement, their breach was not material and does not justify rescission.

### a. *Nature of the Separation Agreement*

 An executory accord, or "accord and satisfaction," is a contract that provides for discharge of prior existing obligations upon satisfaction of the newly bargained-for performance. *Denburg v. Parker Chapin Flattau & Klimpl,* 82 N.Y.2d 375, 383, 604 N.Y.S.2d 900, 624 N.E.2d 995 (1993); *accord May Dep't Stores Co. v. Int'l Leasing Corp.,* 1 F.3d 138, 140 (2d Cir.1993); *Koening Iron Works, Inc., v. Sterling Factories, Inc.,*

No. 89 Civ. 4257(THK), 1999 WL 178785, at *7–8 (S.D.N.Y. Mar.30, 1999). Such a contract is to be distinguished from a substitute agreement: "Whereas an executory accord extinguishes a claimant's prior claims upon performance of the accord, a substitute agreement extinguishes a claimant's prior claims upon execution of the agreement." *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 287 n. 1 (2d Cir.1997); *Denburg*, 82 N.Y.2d at 384, 604 N.Y.S.2d 900, 624 N.E.2d 995 (describing a substitute agreement as "a new agreement, [that] though executory … immediately discharge[s] the existing obligation").

■ When a material breach of a substitute agreement occurs, the non-breaching party may sue on the underlying obligations only if the court orders rescission. *See Knoll v. Merrill Corp.*, No. 02 Civ. 566(CSH), 2003 WL 21556942, at *7 (S.D.N.Y. July 9, 2003); *Perez v. Plaza Hotel*, No. 02 Civ. 2225(GBD), 2003 WL 21135769, at *2 (S.D.N.Y. May 16, 2003). By contrast, when a party materially breaches an executory accord, the non-breaching party may elect to sue on the pre-existing obligations without first obtaining rescission of the accord. N.Y. Gen. Oblig. Law § 15–501(3) ("If an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the claim, cause of action, contract, [or] obligation … which is the subject of the accord, or to assert his right under the accord."); *see Frank Felix*, 111 F.3d at 289 ("New York law would require an executory accord to be materially breached before pre-settlement claims may be reinstated.").

■ The parties' intent dictates the proper characterization of the contract at issue, which is ordinarily a question of fact. *See Frank Felix*, 111 F.3d at 287 n. 1; *Goldbard v. Empire State Mut. Life Ins.*

*Co.*, 5 A.D.2d 230, 234, 171 N.Y.S.2d 194, 199 (1st Dep't 1958) ("The persistent principle to be applied is that of determination of the intention of the parties, as objectively manifested."). However, where the parties have manifested their intent on the face of the document, the court can make this determination as a matter of law based on the documents before the court. *Koening Iron Works*, 1999 WL 178785, at *8; *Goldbard* 171 N.Y.S.2d at 199–200; *see also Rainbow v. Swisher*, 72 N.Y.2d 106, 109, 531 N.Y.S.2d 775, 527 N.E.2d 258 (1988) (where "the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence").

■ A substitute agreement may be evidenced by language indicating that it supersedes and supplants the previous contract, completely replacing an old relationship with a new one. *See Sudul v. Computer Outsourcing Servs., Inc.*, 917 F.Supp. 1033, 1047–48 (S.D.N.Y.1996) (holding that parties who intended to discharge existing obligations and create a new agreement to govern future relations entered into a substitute agreement); *Blair & Co. v. Otto V.*, 5 A.D.2d 276, 280, 171 N.Y.S.2d 203, 207 (1st Dep't 1958) (holding that a substitute agreement exists where the new agreement "terminated and dissolved" the prior agreement). "[F]ormalized papers with unequivocal language" tend to indicate a substitute agreement. *Goldbard*, 171 N.Y.S.2d at 200. An executory accord, on the other hand, may be evidenced by language preserving existing claims until such performance is tendered. *See Denburg*, 82 N.Y.2d at 383, 604 N.Y.S.2d 900, 624 N.E.2d 995; *see generally Koening Iron Works*, 1999 WL 178785, at *7–8.

■ The Separation Agreement is a substitute agreement. Through unequivocal language, the contract reflects the parties' intent to completely dissolve their consulting relationship and enter a superseding agreement:

WHEREAS, the Company and the Consultant have tried to negotiate the basis for the further rendering of such consulting services by the Consultant but have not reached agreement on the terms for such future cooperation, the parties have mutually decided to end the consulting service by the Consultant.

WHEREAS, the Company desires to terminate any and all contracts, agreements and understandings with the Consultant and the Executive and the Consultant and Executive hereby accept such termination on the terms and conditions stated herein....

(Compl.Ex. 7.) Moreover, the Separation Agreement demonstrates a clear intent to extinguish existing claims at the time of contracting, not at the conclusion of First-Gate's payments:

Except for the commitments out of this agreement, Consultant and Executive *do hereby release, remise, acquit and forever discharge* the Company and its officers, directors, executives, shareholders, agents, attorneys, employees, and affiliates (collectively, the "Released Parties"), of and from any and all claims....

(Compl. Ex. 7 § 3 (emphasis added).) Therefore, as a matter of law, the Separation Agreement is a substitute agreement, and not an executory accord. As a result, C3 Media cannot merely elect to resurrect pre-Separation Agreement claims; Plain-

tiff released Defendants of those claims upon the execution of the Separation Agreement. Rather, C3 Media can only undo the effect of the Release by having this Court rescind the Separation Agreement.

#### b. *Propriety of Rescission*

■ Rescission of a contract is "an extraordinary remedy" rooted in equity. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir.2000). New York courts grant rescission only where a party's breach is "material and willful, or if not willful, so substantial as to strongly tend to defeat the object of the parties in making the contract." *Krumme*, 238 F.3d at 143 (internal quotation omitted); *accord Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 215, 475 N.Y.S.2d 869, 874 (2d Dep't 1984).

■ From C3 Media's perspective, FirstGate's promised payments were at the heart of the Separation Agreement and the primary consideration for the Release.[5] Thus, Defendants' failure to make any payment after C3 Media accelerated the entire $135,000 "go[es] to the root of" the Separation Agreement and constitutes a material breach. *Frank Felix*, 111 F.3d at 289.

■ Even so, Defendants' breach does not warrant rescission of the Separation Agreement. Because rescission is an equitable remedy, it "will not be granted unless plaintiff lacks an adequate remedy at law." *Faden Bayes Corp. v. Ford Motor Co.*, No. 97 Civ. 1867(MBM), 1997 WL 426100, at *2 (S.D.N.Y. July 30, 1997) (citing *Babylon Assocs.*, 475 N.Y.S.2d at 874); *see Knoll*, 2003 WL 23018807, at *6 (hold-

---

**5.** Defendants contend that the Release remains valid even though they failed to make any payments because a release may be enforceable even if not supported by consideration. *See* N.Y. Gen. Oblig. Law § 15–303.

However, C3 Media bargained for consideration from Defendants—namely, the installment payments totaling $135,000 and the right to demand the entire amount upon FirstGate's failure to make any one payment.

ing that rescission is appropriate only when "the non-breaching party has been deprived of the reasonably expected benefit of the bargain in a way that cannot be compensated"). Where the plaintiff can fully reap the benefit of its bargain through an award of legal damages, there is no call to invoke the equitable powers of the court and rescind the contract. *See Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) ("[T]he equitable remedy [of rescission] is to be invoked only when there is lacking complete and adequate remedy at law and the status quo may be substantially restored."); *accord New Shows, S.A. de C.V. v. Don King Prods., Inc.,* No. 95 Civ. 8851(RPP), 1999 WL 553780, at *3 (S.D.N.Y. July 29, 1999); 22A N.Y. Jur.2d Contracts § 496 ("An adequate remedy at law defeats a claim for rescission under New York law.").

■ In exchange for the Release, C3 Media bargained for payments totaling $135,000, as well as certain fees and a percentage of FirstGate's net revenue. If successful on its claim for breach of the Separation Agreement, C3 Media stands to receive the full consideration for the Release, plus interest to compensate for FirstGate's failure to pay the promised amounts in a timely fashion. *See Babylon Assocs.,* 475 N.Y.S.2d at 874 (denying a claim for rescission because the party seeking such relief had "an adequate remedy at law, namely recovery of money damages"); *see also Freund v. Wash. Sq. Press, Inc.,* 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) ("[T]he law awards damages for breach of contract to compensate for injury caused by the breach. . . . In other words, so far as possible, the law attempts to secure to the injured party the benefit of his bargain."). Indeed, at oral argument, counsel represented to this Court that Defendants

had deposited into an attorney escrow account sufficient funds to cover Plaintiff's claim for breach of the Separation Agreement. (Transcript of Hearing on Feb. 24, 2005, at 6.) Equity has no place where, as here, money damages will suffice.

This Court will not rescind the Separation Agreement. As such, the Release remains in full force and effect and bars C3 Media's claims that pre-existed the agreement. Defendants' motion to dismiss is granted with respect to those claims.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied part. Specifically, C3 Media's claims against all Defendants for breach of the Consulting Agreement, breach of the Management Agreement, quantum meruit and fraudulent inducement are dismissed with prejudice, as are its claims of fraud against FirstGate and FirstGate AG and its claim to pierce the corporate veil of FirstGate AG. In all other respects, Defendants' motion to dismiss is denied. Thus, Plaintiff's claims for breach of the Separation Agreement and breach of fiduciary duty may proceed, along with its claims of fraud against Webpay, Webpay AG, Siegel and Stangl and its claim to pierce Webpay AG's corporate veil.