[857 NYS2d 146]

J. CHRISTOPHER FLOWERS et al., Appellants-Respondents, v 73RD TOWNHOUSE, LLC, Respondent-Appellant.

First Department, May 13, 2008

## APPEARANCES OF COUNSEL

*Stroock & Stroock & Lavan LLP*, New York City (*Kevin L. Smith* and *David A. Sifre* of counsel), for appellants-respondents.

*Hartman & Craven LLP*, New York City (*Donald L. Rosenthal* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SAXE, J.

Plaintiffs contracted to purchase from defendant a townhouse on East 73rd Street in Manhattan following defendant's custom renovation of the property. After escalating disputes relating to the renovation work, defendant served a notice of termination, and plaintiffs immediately followed with this action for specific performance of the contract of sale. For the reasons that follow, we hold that while the award of specific performance to plaintiffs was proper and should be affirmed, the matter must be remanded for a hearing on the issue of the price abatement to which plaintiffs were entitled, inasmuch as the project was admittedly only 80% to 85% complete. Plaintiffs' entitlement to an abatement is not altered by their request for specific performance before defendant could complete the remaining construction, nor is it precluded by the substantial profit plaintiffs subsequently realized some months later on the property's resale, which profit is, in fact, simply irrelevant to the calculation of plaintiffs' entitlement based upon the contract at issue here.

From a dispute resolution viewpoint, it is tempting to affirm the challenged order in its entirety, since the final result seems to resolve the matter in a manner advantageous to both parties—the developer received its full selling price (without having to complete the work), along with a right to reimbursement for the extra costs of change orders it performed, while the buyers were enabled to resell the property for a large profit. Nevertheless, our determination must focus solely on available rights and remedies under the law based upon the facts at the time of the lawsuit, rather than finding a palatable middle ground based in part upon subsequent events.

Facts

Pursuant to a contract dated January 17, 2004, plaintiffs J. Christopher Flowers and Mary H. White agreed to purchase from defendant 73rd Townhouse, LLC, a custom-renovated townhouse located at 12 East 73rd Street in Manhattan, for the price of $17 million. The parties acknowledged in the contract that the premises were then in the process of being renovated by a contractor retained by defendant, in accordance with the plans and specifications that had been prepared by defendant's architect. While the closing date was set for July 1, 2004, the contract did not make time of the essence.

The plans and specifications incorporated in the contract left open many particulars to be selected by plaintiffs, such as certain construction materials, plumbing fixtures, railings, and finishes, as well as the design of the rear yard. The contract did not set out the parties' understanding of the timetable in which plaintiffs were to make their contemplated selections of materials, finishes, etc., although the topic was discussed in some e-mails and letters. The most comprehensive discussion was contained in an e-mail sent by defendant's architect on December 19, 2003—that is, while contract negotiations were still underway. It did not set any deadlines; rather, it set forth a list of items which plaintiffs were to be responsible for choosing, with dates "for which [plaintiffs] should try to shoot." The list was divided into four categories: "urgent" requirements, which the e-mail said were to be provided by January 19, 2004, "immediate" requirements to be supplied by the week of February 2-6, "midrange" requirements which were to be provided by February 23, and "later" requirements to be supplied by the end of March 2004. On January 14, 2004, when the contract was yet unsigned, another e-mail from defendant's architect was sent to Mary White, indicating that the deadline for

"urgent" decisions was extended to January 26; a January 29 e-mail from plaintiff Mary White indicates an understanding that this deadline for "urgent" decisions had been further extended to February 4, 2004, the date of a scheduled meeting between plaintiffs and the architect. The record contains no indication that as of the time the contract was executed, the parties agreed upon any final schedule or deadlines for the non-"urgent" categories of decisions required of plaintiffs.

The contract also gives plaintiffs the right to make "reasonable adjustments and modifications" (i.e., change orders) to the existing renovation plans. However, contract paragraph 38, which covers purchaser change orders, does not set out a procedure or timetable for how such modifications to the plans would be made and agreed upon. It simply provided that the purchase price would cover change orders of up to $50,000, with plaintiffs responsible for paying the cost of any change orders charged to seller by the contractor by reason of selections made by purchaser which cost more than $50,000; those extra costs to be paid by plaintiffs to defendant within five business days of receipt of defendant's notice of payment for the extra costs, "*accompanied with the invoice from the Contractor together with any supporting documentation* provided in connection therewith" (emphasis added).

Two other provisions of the contract are central to this dispute. Paragraph 34 of the contract provided that plaintiffs could be required to close even if the work was not completed, employing a procedure by which defendant's architect would deliver to plaintiffs a certificate itemizing the remaining work and verifying *either* that the cost of the remaining work was no more than $35,000 *or* that completion had been delayed by change orders requested by plaintiffs. The closing would take place despite the incomplete construction, but defendant would deposit into an escrow account 120% of the cost of completing the remaining work. The final sentence of paragraph 34 reads:

> "Notwithstanding the foregoing, Purchaser shall not be obligated to close unless the Premises is substantially complete with complete access to the interior living space and all of the appliances, plumbing, heating, electrical and other building systems in working order and all major exterior work complete, unless any delay in the foregoing is the result of a change order requested by Purchaser."

In contract paragraph 35, plaintiffs' obligation to close on the sale was made subject to various conditions precedent. Even in the absence of a permanent certificate of occupancy as of the closing date, plaintiffs would remain obligated to close on such date, *provided that*: (i) the work had been substantially completed; (ii) the premises were reasonably determined to be in habitable condition, meaning that all major building systems were in working order; (iii) there was a valid temporary certificate of occupancy; (iv) defendant delivered to plaintiffs a copy of the most recent inspection report received from the Buildings Department, showing no material objections to the major building systems, including electrical, heating, plumbing, sewer and HVAC systems; and (v) defendant would remain responsible for obtaining the permanent certificate of occupancy, would deposit in escrow $500,000 to be held until delivery of a valid permanent certificate of occupancy, and would be subject to other penalties for excessive delay.

Between the time the contract was executed and the contract's closing date of July 1, 2004, the renovation work proceeded. While defendant now asserts that plaintiffs failed all along to abide by the set schedule for selecting construction and design materials, the record fails to establish definite contractual deadlines for any actions on plaintiffs' part, let alone a breach of any such deadline. Nor does the record contain any clear assertion by defendant during this period that plaintiffs' failure to make timely selections was causing undue construction delay. Communications exchanged during this period were basically cordial, and seem to indicate that construction was moving apace.

One issue that arose early in the project was plaintiffs' objection to the original fifth-floor skylight design. An exchange of e-mails as early as March 2004 reflects that suggestions were proposed for a change, and indicates a willingness on defendant's part to make an alteration, although there was no ultimate resolution.

Toward the end of June 2004, more disputes began to arise. Apparently there had been discussion among the parties during a meeting on June 24, 2004 regarding an expected date of completion. An e-mail from the architect to the contractor's representative reports that plaintiffs were under the misapprehension that Dan Kingsford, a partner of defendant, had represented that the whole job—including the rear yard—could be completed by September 1, when in fact, according to the

architect, Kingsford had made clear that this was impossible. Mary White's responsive e-mail dated June 25, 2004, acknowledges the miscommunication, and adds, "We agreed to close when less than $35,000 of work remains. Also, we do not want to move in when stone work or any other substantial or dusty work is underway," asking in conclusion, "when do you think less than $35,000 of work will remain?"

In fact, by this time the completion of the rear yard was quickly becoming a major stumbling block. Defendant's architect asserts that although plaintiffs orally represented when they entered into the contract that the rear yard would be built out in a simple and modest way, and that the design would not hold up the project, this did not prove to be the case. Plaintiffs' mid-April e-mails indicate that they had selected a particular limestone for the rear yard paver, and that a landscape architect was in the process of preparing a design. An exchange of e-mails from June 3 and June 4, 2004 indicates that plaintiffs' landscape designer was in communication with defendant and its contractor as well as plaintiffs, regarding details of the yard work, scheduling and coordination. However, their landscape designer did not provide a final plan for the yard until mid- to late-July. While Mary White states that she approved the final rear yard design on July 15, 2004, and that on July 19 she e-mailed Dan Kingsford to urge him to order the limestone for its construction, defendant states that the contractor only received the final landscape architect's design on July 27, 2004. More importantly, according to defendant, not only was the design far more elaborate than what plaintiffs had promised, but it became apparent at that point that implementation of the rear yard design plan would delay the completion of the construction project for many months. Only upon receipt of the final plans could the contractor order the correct amount and size of limestone from the supplier, and only then could it bid out the job elements; additionally, the stone supplier had a three-month lead time, and would moreover be closed down for the entire month of August. In addition, defendant explains, certain other aspects of the work to be done inside the home, as well as on a planned balcony, had to await completion of some of the yard construction.

Notwithstanding plaintiffs' June 25, 2004 e-mail indicating that they did not want to close until the house and rear yard were completed, and notwithstanding their failure to even provide a final design plan for the yard until mid- to late-July

2004, on July 8, 2004, plaintiffs' attorneys sent a time-of-the-essence letter to defendant's attorneys, noting that the work remained incomplete and requiring the closing to take place no later than August 8, 2004.

While rejecting plaintiffs' time-of-the-essence letter as improper, the law firm representing defendant sent its own time-of-the-essence letter dated July 21, 2004, blaming the delays in completing the work solely on change orders requested by plaintiffs, and asserting that therefore defendant had the right to demand a closing under contract paragraph 34. This letter set August 9, 2004 as the closing date.

Plaintiffs' attorneys responded by letter dated August 2, 2004, protesting that contract paragraph 35 protected them from the obligation to close, since the work was not substantially completed, there was no temporary certificate of occupancy, and the building was not habitable because major building systems were not in working order.

Work meanwhile proceeded. A July 13, 2004 e-mail summarizing a meeting on July 12 indicates that many aspects of construction were then underway: light fixtures were chosen, while shower doors had not yet been chosen, and the architect had received shop drawings from a cabinet maker. The notation regarding the rear yard work was that ideas were under discussion, and a meeting was set with the landscape designer to work out any outstanding design issues; the notation concerning the fifth floor skylight is that Mary White would get back to defendant regarding any decision.

The issue of when the work would be substantially complete, with or without the rear yard, continued to remain a focal point throughout the summer. An August 19, 2004 e-mail from the contractor's representative to the architect seems to have responded to a question regarding a possible completion of the work with the exclusion of the rear yard work. In it, the contractor's representative protested that he was still receiving approvals of various design details, with more to come, and that only after approvals were received could some items, such as moldings, be fabricated and installed. He specified that he expected to complete woodwork in September and October, if he got approved shop drawings returned, that he would not be able to finish floors until December, and that painting would start in November. Additionally, August 2004 e-mails between the stone supplier, the contractor's representative and the architect discuss the supplier's need to receive the design plans in early

September and the expectation that if it did, it would supply the stone at about the end of November.

The parties' conduct toward one another apparently lost its cordiality by August 2004. Defendant's principal, James Rinzler, indicates that he proposed, among other suggested resolutions, a willingness to delay the closing until the work was completed *if* plaintiffs reimbursed defendant for the increased carrying costs incurred over the additional months of carrying the property. He complains that plaintiff Flowers belligerently demanded the completion of the construction, inside and out, pursuant to the plans, without any reimbursement of carrying charges, and threatened to otherwise tie up the property in litigation for years to come, during which time defendant would be saddled with even more carrying costs. But, defendant also asserts that at some subsequent point in August, plaintiffs' representatives indicated that plaintiffs would be willing to walk away from the contract if their down payment were returned. While Rinzler says he suggested splitting the down payment, he also says a suggestion was offered by one of plaintiffs' attorneys that defendant see if it could find another buyer willing to pay enough for the property to make them whole, and Rinzler agreed to look into that.

Defendant also asserts that during August 2004, White ceased cooperating with defendant's need for her approvals and input. However, it is noteworthy that no default was declared based upon any such failure to cooperate, and that despite the parties' posturing and gamesmanship, further work did proceed thereafter.

The scheduled August 9 closing date was adjourned to September 10. According to a September 8 letter by defendant's attorneys, on August 19 the parties agreed to attempt to resolve the remaining issues prior to the closing's adjourned date. However, counsel asserted in the letter, as of September 8 they had been unable to reach an accord on the open issues, and so the September 10 closing date was reiterated. On that date, although plaintiffs' attorney attended the closing with a power of attorney for plaintiffs, he refused to proceed with the closing, citing the failure to satisfy the preconditions of paragraph 35, such as completion of building systems and obtaining a temporary certificate of occupancy. Defendant did not declare a default, however, but rather, withdrew its closing demand, as memorialized in a subsequent letter by defendant's counsel dated September 13, 2004.

Defendant's reason for withdrawing the notice is not set forth in its attorneys' letter. However, James Rinzler asserts that his agreement to withdraw the notice was *not* prompted by a concession that defendant was not entitled to demand a closing, but was instead due to the representation by plaintiffs' attorney that his clients would be willing to walk away from the transaction if they were repaid a substantial portion of their down payment, and that he and his clients would decide on an exact number in the next few days.

Notwithstanding defendant's insistence that it had been ready, and entitled, to close on the sale at the scheduled closing on September 10, 2004, in a letter dated September 23, 2004, defendant's attorney indicated that defendant was proceeding with construction of the premises despite plaintiffs' failure to make the contemplated selections of materials, although it was rejecting as unreasonable plaintiffs' rear yard design plan and the change order by plaintiffs regarding the skylight, and that it anticipated that the premises would be in habitable condition, with a temporary certificate of occupancy, by December 30, 2004. In addition, counsel enclosed with the September 23 letter an earlier letter, dated August 31, 2004, from defendant's architect to plaintiffs, listing 20 items regarding which a decision by plaintiffs was needed. Interestingly, although counsel's letter said defendant was rejecting plaintiff's skylight change order, the enclosed architect's list asserted that he had two models of possible alternatives ready to show plaintiffs. Counsel's letter of September 23 closed with the assertion that plaintiffs' "failure to cooperate and provide a timely response to the requested information is a default under the [c]ontract."

Plaintiffs' counsel responded on September 30, 2004 that in view of defendant's failure to timely indicate that plaintiffs' proposals for the rear yard and the skylight were unreasonable, defendant could no longer properly decline to undertake them at that juncture. Counsel enclosed, along with the letter, plaintiffs' responses to the architect's list of open items to be decided. Counsel added a demand for an unequivocal representation that the house would be completed by November 20, 2004.

In October 2004, defendant entered into a contract to sell the property to a third party for the price of $18 million.

On November 8, 2004, defendant sent plaintiffs a termination notice declaring that plaintiffs were in default for failure to pay for change orders pursuant to paragraph 38 of the contract.

This action for specific performance was then immediately commenced, seeking a direction that defendant complete performance of its obligations under the contract and thereafter transfer the property to plaintiffs for $17 million.

Defendant's answer contained four counterclaims. The first alleged that plaintiffs breached the contract by failing to close on September 10, 2004, and sought as consequential damages the additional carrying costs it paid; the second alleged a default by failure to pay for change orders pursuant to paragraph 38, and sought a money judgment for sums owed to it for change orders; the third, again alleging the breach based upon failure to close on September 10, sought an award of the contract deposit; the last sought a declaration that defendant was entitled to the contractual remedy of recovery of the contract deposit.

The order on appeal granted plaintiffs summary judgment awarding specific performance of the contract, albeit without the price abatement plaintiffs sought. Defendant was directed to turn over title to the property upon payment by plaintiffs of the remaining contract price; the order also directed that plaintiffs deposit $575,000 in escrow for possible payment of change orders completed by defendant. A subsequent order dated February 15, 2007, not currently under appellate review, directed the payment to defendant of approximately $457,000 from the change order escrow account.

The court-ordered closing took place on November 29, 2006. Some five months later, in April 2007, plaintiffs conveyed the townhouse to a third party for a selling price of $23 million. There is no indication in the record as to whether plaintiffs undertook any further construction work on the property prior to the resale.

Discussion

It is apparent that both parties contributed to the development of the ultimate impasse. Plaintiffs contributed to the problem when they simultaneously insisted on the speedy completion of the work, while failing to speedily provide the choices, information and approvals necessary to get some of the underlying work underway. On the other hand, some of the submitted documents indicate that aspects of the incomplete construction derived from failures of defendant's representatives or employees to timely follow up on their responsibilities. Furthermore, the record fails to establish that any representative of defendant made clear to plaintiffs why it could not order the limestone pavers as soon as Mary White first selected the

stone, or how the rear yard design which was submitted in July would delay not only construction of the rear yard, but also the completion of other elements of the construction, including the rear balcony and kitchen.

An additional element in the parties' strained interactions and the resulting impasse was the financial strain caused to each side by the additional delay. Defendant was saddled with many additional months of expensive carrying costs on the property, while plaintiffs, having sold their prior primary residence, found they needed to find and take on the cost of an alternative residence, as well as to place items purchased for the new residence into storage. Yet, in view of the parties' conduct, the additional costs did not provide either party with valid grounds to declare a default under the contract or claim consequential damages. Plaintiffs' delayed decisions simply were not, in themselves, an event of default under the contract, nor did defendant even take that position prior to commencement of the litigation.

Nor do the counterclaims interposed by defendant, or the submissions defendant offered in their support on the summary judgment motion, establish a viable claim that plaintiffs were in default. These counterclaims were predicated upon either the claim that plaintiffs failed to pay for change orders as required, or the allegation that they failed to close on September 10, 2004.

As to the purported failure to close, defendant argues on appeal that it was entitled to close on September 10, 2004 pursuant to paragraph 34 of the contract since, it says, its inability to complete construction was due to plaintiffs' change orders. It reasons that plaintiffs were in default when they refused to close based upon their erroneous reliance on contract paragraph 35, requiring a temporary certificate of occupancy and the completion of basic building systems prior to closing. However, defendant's claimed right to compel a closing under contract paragraph 34 is fatally flawed by defendant's failure to comply with the prerequisites required by that provision. Specifically, defendant cannot establish that on September 10, 2004, its architect had ready a certification of the work remaining to be completed and its cost, as contemplated by paragraph 34, let alone that it had deposited in escrow an amount equal to 120% of the calculated cost of completing construction, as the provision further requires.

In addition, it is established that after the meeting on September 10, 2004, defendant withdrew its demand to close,

which withdrawal it then memorialized in a letter dated September 13, 2004. Although the parties disagree about what prompted defendant to withdraw the demand, that dispute is not material to the issues at hand. At least absent any indication in its September 13, 2004 letter that the withdrawal was conditioned on—or even prompted by—plaintiffs' asserted willingness to walk away from the contract under certain conditions, it may not be allowed to retroactively reinstate the demand in order to complain of plaintiffs' noncompliance with it.

The remaining ground claimed by defendant on appeal for its assertion of default by plaintiffs is plaintiffs' general delay. However, defendant cannot point to a particular provision of the contract that plaintiffs breached, or the point in time at which they did so.

The motion court correctly concluded that defendant's purported termination of the contract on November 8, 2004 was invalid. Defendant could not properly claim that plaintiffs had defaulted on their obligation to pay for change-order work since it had not made the demand for such payment in the manner required by the contract.

The contractual provision upon which defendant relies, paragraph 38, provides that the cost of any change orders "shall be payable . . . within five (5) business days of receipt of Seller's notice of payment therefor which shall be accompanied with the invoice from the Contractor together with any supporting documentation provided in connection therewith." It is uncontested that defendant's demand was not "accompanied with the invoice from the Contractor together with any supporting documentation provided in connection therewith." Indeed, defendant did not offer the invoices to support its demand for payment under the change orders until after it had filed its answer and counterclaims in this lawsuit, nor did it demonstrate that it had actually paid the contractor's invoices.

Rather, the showing defendant offered in support of the purported termination is the recitation that at the parties' September 10th meeting, Rinzler "asked" plaintiffs to pay for the various change order jobs that Dr. White and her designers had requested, and that when plaintiffs did not thereafter respond, defendant's attorney sent a letter dated October 14, 2004, which demanded "payment for all amount[s] previously remitted by our client for [c]hange [o]rders requested by your client." A subsequent letter dated November 5, 2004 asserted

that plaintiffs were in material breach of their obligation to pay invoices for change orders within five business days, and, finally, the termination letter of November 8, 2004 was issued.

In the absence of any showing that the necessary documentation was annexed to defendant's demand for payment for change orders, defendant's November 8, 2004 letter was ineffective to terminate the contract. Defendant's assertion in that letter that the contract was terminated was not only incorrect, but it in effect constituted a breach of the contract (see GDJS Corp. v 917 Props., 99 AD2d 998 [1984], appeal dismissed 62 NY2d 942 [1984]). Under contract paragraph 23 (b), if defendant breaches, "Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including but not limited to specific performance."

Specific performance, under these circumstances, was proper (see EMF Gen. Contr. Corp. v Bisbee, 6 AD3d 45, 51 [2004], lv dismissed 3 NY3d 656 [2004], lv denied 3 NY3d 607 [2004]). While, as defendant points out, there are disputes of fact about what was and was not said and done, particularly beginning in the summer of 2004, those disputes are not material to plaintiffs' right to relief. Plaintiffs and their representatives may have taken inconsistent actions and changing positions in the period leading up to the commencement of litigation, as the parties blamed each other for the delays and their concomitant increasing expenses. But, the part plaintiffs played in the delays and the impasse, in the posturing and gamesmanship, fails to establish that they were not ready, willing and able to perform their contractual obligations, as the law requires (see Huntington Min. Holdings v Cottontail Plaza, 60 NY2d 997, 998 [1983]). Although the equitable defense of unclean hands, if sufficiently established, may preclude the equitable relief of specific performance (see Pecorella v Greater Buffalo Press, 107 AD2d 1064, 1065 [1985]), defendant's submissions do not establish the type of misconduct that can render specific performance unavailable.

We part ways with the motion court's analysis insofar as we conclude that the award to plaintiffs of specific performance did not eliminate plaintiffs' right to seek a price adjustment to compensate them for the incomplete renovation. Defendant's architect acknowledged that at the time of the court-ordered closing, the construction was only approximately 80% to 85% completed; consequently, the property plaintiffs received was necessarily worth less than the value the parties had assigned to the property had it been completed as contemplated by the contract.

As the Court of Appeals observed in *Judnick Realty Corp. v 32 W. 32nd St. Corp.* (61 NY2d 819 [1984]), there is no inconsistency in a plaintiff seeking both specific performance and an abatement in the contract price when the subject of the contract is not delivered in the completed form contemplated by the contract. Indeed, these circumstances bear some similarity to the illustration contained in the Restatement:

> "A contracts to transfer land to B and to make specified repairs and complete an unfinished building on the land. A repudiates and B sues for specific performance. Specific performance of A's duty to transfer the land may be granted *with an abatement in the price* or other compensation sufficient to enable him to make the repairs and complete the building himself." (Restatement [Second] of Contracts § 358, Comment *c*, Illustration 4 [emphasis added].)

Plaintiffs' demand for specific performance without defendant's completion of the construction in no way waived any right to an abatement. Plaintiffs' position, in the context of this litigation, that defendant should not proceed with further work on the construction was simply a by-product of the dispute and resulting mutual distrust, and fails to establish the elements of a waiver of an existing right.

We note that the parties' contract specifically contemplated the possibility of a closing on the sale before construction was completed, and provided for a means of determining, after the closing, the cost of completing the work, so that defendant could set aside that amount in escrow to ensure the work was paid for. Contract paragraph 34 set out a thorough procedure by which the parties could, after a closing at the full contract price, hash out the actual cost of completing the uncompleted work. It contemplated that defendant's architect would prepare a certificate itemizing the remaining work and its cost (and defendant placing in escrow 120% of that cost), and if plaintiffs disagreed with that assessment, they could submit a statement prepared by another architect or engineer setting forth detailed objections, and if the two experts could not come to terms, they could select a third architect or engineer whose determination would be final and binding. The escrow agent would then make payments out of that escrow for work performed.

Although defendant did not properly trigger this procedure when it sought a closing on September 10, 2004, and although

the motion court, when it granted specific performance and directed a closing at the contract price, did not look to that contractual procedure, its existence in the contract serves to emphasize that defendant is only entitled to receive the unabated, full contract price where the work contemplated by the contract is complete.

Plaintiffs' right to a price abatement based upon the incomplete state of the construction project at the time of the closing is unaffected by whether plaintiffs actually undertook completion of the construction work. Their entitlement to the cost of completion is not based upon additional payments they made; it is based upon the reduced value of the property, since the price the parties agreed on for the property is inapplicable if construction is incomplete.

Plaintiffs' right to a price abatement based upon the incomplete construction is also not logically or equitably affected by the approximately $6 million in profit plaintiffs earned on the resale of the property some five months after they took title. Their right to relief here is derived from the agreed-on value of the completed property as reflected in the contract, from which must be deducted the value of the cost of completing the unfinished work. It is completely irrelevant to the analysis that five months later, the value of the property proved to be substantially greater than that to which the parties agreed when they entered into the contract. Indeed, if the value of the property had substantially decreased in those subsequent months, we would not calculate the parties' rights differently; neither should we make any adjustment based upon a subsequent increase in the value of the property.

Since it is apparent that the parties could not initially, or at the time of the closing, cooperate in the process of completing construction as paragraph 34 requires, we cannot now direct the adoption of its procedures. The best alternative at this juncture in order to arrive at the correct result is to hold an evidentiary hearing on the cost of completion of the construction. At that hearing, defendant will have the right to challenge and disprove the validity of the assessment by plaintiffs' expert of the proper abatement amount, which was, in defendant's view, so egregiously excessive as to demonstrate that no such abatement should be awarded.

Finally, we reject plaintiffs' suggestion that this Court should direct the return of the $456,982 paid out to defendant from the $575,000 plaintiffs placed in escrow. The aspect of the court's

directive currently before us, which directs the placement of funds in escrow in contemplation of reimbursing defendant for change orders it undertook, was appropriate.

Accordingly, the order of the Supreme Court, New York County (Jane S. Solomon, J.), entered October 20, 2006, which directed specific performance by defendant under the parties' contract without adjustment of the purchase price to reflect the cost of completing the incomplete work, should be modified, on the law, to the extent that the matter is remanded for a hearing on the issue of the amount of price abatement to which plaintiffs are entitled for the cost of completing the renovation work contemplated by the contract, and as so modified, affirmed, without costs. Appeal from order, same court and Justice, entered on or about September 29, 2006, which denied defendant's motion to dismiss plaintiffs' claim for specific performance, should be dismissed, without costs, as superseded by the appeal from the order of October 20, 2006.

MAZZARELLI, J.P., GONZALEZ and ACOSTA, JJ., concur.

Order, Supreme Court, New York County entered October 20, 2006, modified, on the law, to the extent that the matter is remanded for a hearing on the issue of the amount of price abatement to which plaintiffs are entitled for the cost of completing the renovation work contemplated by the contract, and as so modified, affirmed, without costs. Appeal from order, same court, entered on or about September 29, 2006, dismissed, without costs, as superseded by the appeal from the order of October 20, 2006.